Argued April 2; affirmed May 19; rehearing denied June 16, 1942

# SHIVES *v.* CHAMBERLAIN ET AL.

(126 P. (2d) 28)

Before KELLY, Chief Justice, and BAILEY, RAND, ROSSMAN and BRAND, Associate Justices.

*Frank S. Senn*, of Portland (Senn & Recken, of Portland, on the brief), for appellants.

*Barnett H. Goldstein* and *Bartlett Cole*, both of Portland, for respondent.

KELLY, C. J. During the period of time involved herein Dr. Charles T. Chamberlain, now deceased, Dr. Harry M. Hendershott and Dr. Wilford H. Belknap were associated together as partners, engaged in the practice of medicine and surgery as specialists in the

treatment of diseases of, and injuries to, the eye, ear, nose and throat, with their offices in Portland, Oregon.

Subsequent to the institution of this action, wherein the complaint was filed on July 23, 1940, namely, in the month of December, 1940, Dr. Chamberlain died, and, seasonably thereafter, the executrix of his last will and testament and estate was substituted as defendant in his stead.

In 1932, plaintiff first applied to Dr. Chamberlain for professional attention. Dr. Chamberlain's record discloses that on the 10th day of November, 1932, while then in consultation with Dr. Chamberlain, plaintiff complained of watering of the right eye, and Dr. Chamberlain removed milia therefrom, which, as the testimony shows, are little stopped-up glands along, more or less, the border of the lid.

According to Dr. Chamberlain's record, the second call plaintiff made upon him occurred upon November 30, 1932, when Dr. Chamberlain removed more of those milia from the upper lid, and at the same time the patient complained of a slight haze over the right eye. That record, namely, Dr. Chamberlain's, discloses that plaintiff visited the doctor again on March 1, 1933.

In April, 1933, Dr. Chamberlain treated plaintiff for some impairment of hearing.

On December 14, 1933, Dr. Chamberlain made an examination of both of plaintiff's eyes and recorded that at a distance of fifteen feet plaintiff's vision of both eyes was normal. At that time, it is noted that plaintiff used a reading glass which gave him normal reading.

The next visit that plaintiff made to Dr. Chamberlain occurred on July 30, 1937. Again on September 24, 1937, and on October 24, 1937, also on January 3, 1938, on April 1, 1938, on June 13, 1938, and on Sep-

tember 20, 1938, plaintiff called upon and consulted Dr. Chamberlain.

Dr. Chamberlain's record of plaintiff's condition upon September 20, 1938, is as follows:

"Shives, Jas. M.
9/20/38. Total loss of vision in O. D. since July 10th. Probably detachment of retina. Cannot make out any details of fundus." [The letters O. D. signify the right eye.]

Upon cross-examination of plaintiff, after objection had been made to defendants' attorney stating the contents of Dr. Chamberlain's records when they had not been introduced in evidence, the transcript of testimony discloses the following cross-examination:

"Mr. Senn: I will introduce them, but I want to ask you if you didn't make this statement to Dr. Chamberlain on September 20, 1938, as disclosed by the record that you had lost the sight of your right eye since July 10th, that you had not been able to see since July 10th?

A. I don't see how I could lose it all at once in one day, but I had not been able to see for some time before that.

Q. Out of the right eye?

A. Yes, out of the right eye.

Q. And that extended back to July 10th, as the notation says?

A. That might be all right, but I went to see Dr. Chamberlain in August, but they told me to come back, that he was busy with the school children.

Q. Well, now, then isn't it a fact that the vision of your right eye had disappeared on about July 10, 1938?

A. It probably is."

Subsequently to September 20, 1938, plaintiff did not return to Dr. Chamberlain, but on March 21, 1939, consulted Dr. J. E. Weeks, another specialist in the treatment of diseases of the eye, who diagnosed plaintiff's malady as glaucoma.

Plaintiff charges that defendants, acting at all times by Dr. Chamberlain during all the time above mentioned, failed to make the usual tests of plaintiff's eyes for glaucoma and neglected and failed to diagnose correctly plaintiff's illness, and failed and neglected to treat plaintiff's eyes for glaucoma; and that, if defendants had exercised ordinary reasonable care, skill and judgment, said disease would have been detected by them and plaintiff's eyesight saved by an operation to relieve the tension of the eyes.

Defendants assign the following errors:

1. That the motion for involuntary nonsuit should have been granted.

2. That the motion for a directed verdict should have been granted.

3. That the court should have given defendants' requested instruction taking away from the jury any injury or damages to the right eye, because of the statute of limitations, and because there was no evidence that plaintiff had lost the sight of the right eye on account of glaucoma.

4. That the verdict is excessive and given under the influence of passion and prejudice.

The first two assignments may be properly considered together. These two assignments of error are based upon the contention that there is no competent evidence that at the time plaintiff was treated by Dr. Chamberlain, plaintiff was suffering from glaucoma; or that Dr. Chamberlain was careless or negligent in failing to discover the existence of glaucoma; or that Dr. Chamberlain failed to give any treatment for glaucoma; or that, because of the failure to discover and treat glaucoma, plaintiff has been damaged.

Bearing in mind that six months and one day intervened between plaintiff's last visit to Dr. Chamberlain

and his first call upon Dr. Weeks, we must review the record to determine whether there is any substantial evidence tending to prove that at the time Dr. Chamberlain was treating plaintiff, plaintiff was suffering from glaucoma.

Dr. Weeks testified that in cases of glaucoma, when the tension goes above the upper limit of normal, "the eye is in danger of gradually losing its vision, very gradually in the majority of cases". He also testified that when he examined plaintiff's eyes, he found the tension of the left eye somewhat above the upper limit of normal. Dr. Weeks also testified that in plaintiff's case there was a gradual development of glaucoma.

One of the defendants, Dr. Harry M. Hendershott, was asked, whether or not glaucoma is a comman disease in people past 50 years of age, to which he answered, "Fairly so".

The record shows that when Dr. Chamberlain first treated him plaintiff was over 50 years of age.

Dr. Hendershott was further questioned and made answers as follows:

"Q. And it is a condition in people past 50 years of age that eye specialists are always on the lookout for where there is an impairment of vision?
A. Right.
Q. And particularly is that so if the vision continually gradually deteriorates and becomes worse, is that right?
A. Yes, that is right.
Q. Now, as I gather from you, Dr. Hendershott, one of the ravages of a glaucomatous condition is blurring and impairment of vision?
A. That is right."

Blurring and impairment of vision in plaintiff's case were continually present.

With reference to the record made of plaintiff's case by Dr. Chamberlain, Dr. Hendershott gave the following testimony:

"Q. Now, then, between the period of July 30, 1937, and September 20, 1938, that is what happened during that interval: The vision of his right eye was completely lost for all practical purposes, is that right?

A. Yes, that is what the record says.

Q. And the vision of his left eye at the time of the last record indicates that it had been impaired to some, I have forgotten now, 6 or 7 per cent?

A. Yes, something like that.

Q. And the records likewise show that his vision was not impaired as far as seeing or reading other than with corrective glasses at the outset?

A. That is right.

Q. So it shows a progressive deterioration and loss of vision during the fourteen months he was under Dr. Chamberlain's care, is that right?

A. You see, on June 13, 1938, his vision was 15/30ths in the right eye and 15/20ths in the left eye.

\* \* \* \* \*

Q. On June 13, 1938, there was only approximately how much loss of his right eye at that time, just a month before he lost it completely?

A. Only a small percentage

\* \* \* \* \*

Q. I am just stating to you that within a period of one month from June 13th to July 10th, 1938, the right eye, from a small impairment, became a total loss?

A. That is right."

Plaintiff was asked:

"Q. Now, when you went to see Dr. Weeks in March, 1939, was your condition at that time substantially the same as it was in September, 1938?"

To which plaintiff answered:

"A. Yes, substantially."

Besides the foregoing, the record indisputably reflects the sad fact that under Dr. Chamberlain's treatment, plaintiff's condition grew slowly but steadily worse. Dr. Chamberlain was not treating plaintiff for glaucoma. It is shown with equal certainty that when plaintiff followed the advice of Dr. Weeks and submitted to an operation for glaucoma, the progress of his malady was stopped and such vision as he then had was preserved. In other words, treatment recognized as proper in cases of glaucoma brought favorable, prognosticated results; while treatment, not based upon a diagnosis that the case was one of glaucoma, was unavailing.

■ In view of this state of the record, which presents a review of the record most favorable to plaintiff, we are not able to concur with defendants that there was no substantial, competent, testimony to the effect that, when plaintiff was under Dr. Chamberlain's care and treatment, he was suffering from glaucoma.

Dr. Chamberlain's treatment based upon his diagnosis resulted in progressive deterioration in and partial destruction of plaintiff's vision. The treatment based upon Dr. Weeks' diagnosis checked the deterioration and preserved the impaired vision which plaintiff then had. To the writer, it is plainly within the province of a lay mind to deduce from those facts the conclusion that Dr. Chamberlain's diagnosis and treatment were radically, almost tragically, wrong and that Dr. Weeks' diagnosis and the treatment given pursuant to his advice were right.

■ With due respect for the medical profession in considering the record before us in this case, the writer can see no valid reason for holding that it requires the direct testimony of some member of that learned and vitally necessary calling, to the effect that the first-

684

mentioned diagnosis and treatment were wrong and the second were right, in order to sustain a finding by the court to that effect.

■ As to whether Dr. Chamberlain was careless or negligent in failing to discern the existence of glaucoma, the testimony of Dr. Weeks discloses that the approved method of testing the eye, to determine whether a glaucomatous condition is present, is by the use of a tonometer. It appears that Dr. Chamberlain made no such test, and that presented a question for the jury to determine whether Dr. Chamberlain, in the exercise of the degree of care imposed upon him, should have used the method described by Dr. Weeks.

■ With reference to the charge that error was committed in refusing to withdraw from the jury as an element of recoverable damage a consideration of the damage to the right eye, we are required to determine whether as to that eye there is any substantial evidence tending to prove that it was glaucomatous.

The testimony of Dr. Weeks is to the effect that, while secondary glaucoma, that is, glaucoma resulting from an injury or some disease may be confined to but one eye, usually primary glaucoma affects both eyes. There is nothing in the record tending to prove that plaintiff's case, if one of secondary glaucoma at all, was confined to but one eye. From the treatment by Dr. Chamberlain on December 14, 1933, to the last consultation on September 20, 1938, both eyes were affected in such a way as to prompt Dr. Chamberlain to consider them, and taking the testimony just mentioned of Dr. Weeks together with the other testimony to which we have heretofore referred, we are of the opinion that it cannot be said that there is no testimony of a substantial character tending to prove that plaintiff's right eye was glaucomatous.

As to the claim for damages, based in part upon the damage to the right eye, it appears that by July 10, 1938, the vision of the right eye was completely destroyed. This action was not instituted until July 23, 1940, more than two years having intervened between the total loss of sight in the right eye and the institution of this action. It is therefore argued that as to the damage to the right eye, the statute of limitations has run; and, for that reason, the court erred in refusing to withhold that phase of the case from the jury as a basis for damages to be awarded.

■ The statute of limitations begins to run in cases of this character when the action or omission constituting the malpractice has occurred.

There are numerous cases of malpractice wherein a surgical operation has been performed. Some of them hold that the statute of limitations in such cases begins to run at the time the operation is performed. Others hold that in such cases, where subsequent treatment is rendered by the physician, the statute does not begin until such treatment ceases. Many of these cases are cited and analyzed in an annotation to the case of *Schmit v. Esser*, 74 A. L. R. 1312, at page 1318, et seq.

■ In the case at bar, no surgical operation was performed and hence, by parity of reasoning, the statute of limitations should not begin until the treatment by Dr. Chamberlain was discontinued. This continued treatment, when shown to have been based upon a mistaken diagnosis and not of a character employed by the medical profession in dealing with cases of glaucoma, constituted a continuing tort causing the statute of limitations to start only when such treatment ceased.

It would unduly extend this opinion, if an analysis were undertaken of each case cited by counsel. One

case, however, was stressed by defendants' attorney and that is the case of *Ewing v. Goode*, 78 Fed. 442. In that case, an auxiliary operation, or "preliminary iridectomy" was performed on plaintiff's eye on the 8th day of July, 1895. On the 25th of September following, the main operation was performed. The purpose of this course was to remove a cataract from plaintiff's eye. In that case, it appears that the eye had been carefully examined since July 8th for tension. Besides that, the instrument known as a tonometer, now in general use, had not been invented. From this brief statement, it will be seen that there is a wide distinction between the Ewing-Goode case and the one at bar. In the instant case, there was no operation, there was no test for tension, and there was an instrument available and in common use for accurately measuring the tension, but it was not used by the attending physician.

■ In this case, as stated, the services of Dr. Chamberlain as the physician treating plaintiff's eyes did not end until September 20, 1938. For this reason, we hold that when this action was instituted, the statute of limitations had not run with reference to any damage plaintiff may have suffered by reason of the glaucomatous condition of either or both of his eyes.

The vice of defendants' contention that the statute of limitations barred plaintiff's recovery for the total loss of vision in his right eye lies in the failure to bear in mind that the gravamen of plaintiff's cause of action is the failure to diagnose and treat a case of glaucoma, not necessarily but one eye, not necessarily both eyes, but the malady known as glaucoma whatever the result of that malady in the case in hand might be. The effect upon either one or both eyes of such failure certainly cannot become the subject of partition or division or pro rata allocation of the amount of dam-

ages to be awarded at different stages of the progress of the malady.

To apply such a principle would require an assessment of the value of successive pains resulting from rheumatism, assuming that rheumatism is curable; that the defendant physician diagnosed it as seasickness; and that the agony once experienced, because of rheumatism, in the left ankle, moved its habitat over to the right shoulder more than two years before the action to recover for malpractice was instituted. In that case, the cause of that suffering would be the failure of the defendant physician to treat the case for what it was, namely, rheumatism. Or, assuming that the malady had rendered the left ankle entirely useless more than two years before the action was instituted, and then the rheumatism had attacked the right ankle; but not until the right ankle had grown more and more painful and unable properly to function was the service of the defendant physician discontinued. In such a case, the writer thinks that the only fair conclusion to draw would be that at all times from the inception of the defendants' treatment to its termination it was a continuing tort arising from defendants' failure properly to diagnose and treat a case of rheumatism. In making this rather crude illustration, the writer realizes that an assumption that rheumatism is curable may be debatable.

■ As to the contention that the verdict is excessive and the result of passion or prejudice on the part of the jury, while we fully realize that it is a large verdict, we cannot affirmatively say that there is no evidence to support it in its entirety.

The judgment of the circuit court is affirmed.

Mr. Justice BELT and Mr. Justice LUSK did not participate in this opinion.