Argued and submitted January 10; reassigned December 2, 1992, decision of the Court of Appeals affirmed on different grounds, judgment of the circuit court reversed in part and case remanded to the circuit court for further proceedings May 13, 1993

## William A. STEVENS and Janice Stevens, *Respondents on Review,*

*v.*

## Joseph D. BISPHAM, *Petitioner on Review.*

(CC A8904-02189; CA A64459; SC S38574)

851 P2d 556

Lisa C. Brown, Portland, argued the cause for petitioner on review. With her on the petition was Janice M. Stewart, of McEwen, Gisvold, Rankin & Stewart, Portland.

David Gernant, Portland, argued the cause for respondents on review. With him on the response brief was Steven L. Myers, of Myers & Knapp, Portland.

GILLETTE, J.

Unis, J., specially concurred and filed an opinion in which Fadeley, J., joined.

## GILLETTE, J.

This is a professional negligence action brought by a former criminal defendant against the lawyer who defended him. The issue presented for our decision is this: At what point does the statute of limitations for legal malpractice begin to run with respect to a lawyer's defense of a client who has been convicted in a criminal case? We hold that it does not begin to run until the plaintiff has been exonerated of the criminal offense through reversal on direct appeal, through post-conviction relief proceedings, or otherwise.

Plaintiff, charged with three counts of Robbery I, three counts of Menacing, and one count of Public Indecency, was convicted and sentenced to imprisonment for eight and one-half years. He began serving his sentence. His convictions were vacated after another person confessed to the crimes. Plaintiff then filed this negligence action for legal malpractice against defendant.[1] Defendant moved for summary judgment on the ground that plaintiff had failed to file the action within the two-year statute of limitations. ORS 12.110.[2] The trial court granted defendant's motion, and plaintiff appealed. The Court of Appeals, concluding that there were unresolved questions of material fact, reversed and remanded. *Stevens v. Bispham*, 108 Or App 588, 816 P2d 700 (1991). We affirm the decision of the Court of Appeals, but on different grounds.

■■ On review of a summary judgment, we determine whether the moving party is entitled to judgment as a matter of law. ORCP 47C; *Seeborg v. General Motors Corporation*, 284 Or 695, 699, 588 P2d 1100 (1978). In reviewing a trial court's ruling on a motion for summary judgment, we view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Whitaker v. Bank of Newport*, 313 Or 450, 452, 836 P2d 695 (1992).

---

[1] Plaintiff's wife initially was a co-plaintiff, alleging a claim for loss of consortium. At her request, the trial court entered a judgment of dismissal of her claim without prejudice pursuant to ORCP 54A(2). She is not involved in this appeal.

[2] ORS 12.110(1) provides in part: "An action * * * for any injury to the person or rights of another not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years[.]" An action for professional negligence is one "not especially enumerated in this chapter."

On October 23, 1986, three women who had stopped to look at the Sahalie Falls were accosted by a man wearing a dark green ski mask. The man demanded the women's underwear and waved a knife at them while he exposed himself. As he fled, the man removed his mask, revealing his face to one of the victims. The victims observed a "newer" gray Isuzu pickup truck with a gray canopy in the parking lot.

At the time of the incident, plaintiff was on probation for a conviction for misdemeanor indecent exposure. Plaintiff's probation officer questioned him about the incident. Plaintiff denied committing the crime and consented to a polygraph examination. In the interview conducted by the polygraph operator before administering the test, plaintiff acknowledged that, about the time of the crimes, he had driven through the area where the crimes occurred on his way to Paisley to pick up his wife. Plaintiff insisted, however, that he had not gone to Sahalie Falls.

When plaintiff was advised that the polygraph examination indicated that he had been deceptive about his involvement in the incident, plaintiff became agitated and admitted that, while he was on his way to Paisley, he may have seen two or three women getting into a car. Plaintiff pulled out a pocket knife, held it to his throat, and threatened suicide. Police officers subdued him and held him in temporary confinement due to his mental condition.

Later that day, plaintiff's wife consented to a search of their home and their two vehicles, a 1974 red Maverick and 1972 white Chevrolet pickup truck, which had no canopy. The police seized a dark green stocking cap and a large folding knife from plaintiff's residence. Plaintiff's wife told the police that she believed that her husband had been cutting wood on October 23 and that he had not picked her up in Paisley until November 6.

The victim who had seen the assailant's face picked plaintiff's picture out of a photographic display. Several days later, a detective showed the victim two more recent photographs of plaintiff, and the victim said that she believed that plaintiff was the man who had accosted her.[3] The detective

---

[3] In this action, the victim filed an affidavit in which she stated that, after personally observing plaintiff in December 1988, she could say with absolute certainty that he was *not* the man who had accosted her.

contacted plaintiff's employer and confirmed that plaintiff had not worked on October 23, 1986. The victim later positively identified the color, but not the style, of the seized stocking cap. She could not positively identify the knife.

At his arraignment on November 17, 1986, plaintiff pleaded not guilty to all charges. The trial court appointed defendant to represent plaintiff. Defendant met with plaintiff three or four times, generally with plaintiff's wife also present. Because plaintiff could not read, defendant read the police reports to him and discussed the evidence with him. Plaintiff consistently denied committing the crimes. Plaintiff told defendant that, on the day of the crime, he was cutting firewood with his two young children. Plaintiff and his wife gave defendant the names of possible witnesses who might confirm that they had observed plaintiff leaving on October 23 to cut wood and returning home with wood.

Defendant obtained approval from the court to hire an investigator and to have plaintiff examined by a psychiatrist to determine if he was competent to aid and assist in his defense. Thereafter, however, defendant neither hired an investigator nor had a psychiatric evaluation performed. Defendant also made no attempt to interview any of the three victims.

On March 29, 1987, two days before trial, defendant told plaintiff that the state had a strong case and that he thought that plaintiff would be convicted. Defendant also told plaintiff that the polygraph results probably would be admissible at trial and would be very damaging to his case. Defendant did not tell plaintiff that the prosecutor had agreed that plaintiff's misdemeanor conviction for indecent exposure would not be used against him at trial. Defendant advised plaintiff that the judge likely would give him a lighter sentence if he pleaded no contest than if he were to be convicted after a jury trial. Defendant further told plaintiff that he must decide that day whether he wished to change his plea. In his deposition in this action, plaintiff testified that, although he had thought that he wanted a trial on the criminal charges, he decided to take defendant's advice. However, plaintiff never told defendant that he wanted a jury trial.

On March 31, 1986, plaintiff withdrew his plea of not guilty and entered a no-contest plea to the four counts against him. At the plea hearing, the judge asked plaintiff if he was satisfied with the help that his lawyer had given him. Plaintiff responded, "Yes, I am." In his deposition in this action plaintiff testified that, when he entered his no-contest plea, he was not satisfied with defendant's representation, because plaintiff knew that he was going to prison. He thought that defendant should have done something "besides just giving me years." He thought that some investigation would have proven his innocence, but he did not know what kind of investigation. He did not want to plead no contest, but he relied on defendant's advice.

On July 8, 1987, the trial court entered judgment of conviction and sentenced plaintiff to eight and one-half years in prison. Defendant's representation of plaintiff ceased on that day. Plaintiff began serving his sentence immediately. On April 22, 1988, another man confessed to the crimes. On April 27, 1988, the trial court vacated plaintiff's judgment of conviction. On May 21, 1988, plaintiff contacted a lawyer concerning his civil claim against defendant in this case.

On April 24, 1989, plaintiff filed this action against defendant for professional negligence. That date was more than two years after plaintiff had entered his no-contest plea, but within two years of his conviction and incarceration and less than one year after the judgment of conviction was set aside. Plaintiff alleged in his complaint that, if defendant had provided adequate representation, he would have been acquitted or all charges would have been dismissed. Plaintiff further alleged that defendant was negligent in (1) failing to seek suppression of the photographic identification, (2) failing to investigate, (3) failing to request a lineup, (4) failing to keep plaintiff informed, (5) failing to consult with or refer plaintiff to a more experienced lawyer, (6) advising plaintiff to plead no contest, (7) waiving a hearing in mitigation at sentencing, and (8) failing to have plaintiff examined by a psychiatrist. Defendant's answer denied the allegations of negligence and, as an affirmative defense, pleaded that the statute of limitations had run.

Defendant moved for summary judgment on his affirmative defense. The trial court granted defendant's

motion. Plaintiff appealed. The Court of Appeals reversed and remanded, holding that there existed a genuine issue of material fact regarding when plaintiff's claim had accrued and, therefore, that summary judgment was not appropriate. *Stevens v. Bispham, supra*, 108 Or App at 594.

■ ■ A claim for professional negligence in the form of legal malpractice must be commenced within two years of the date on which the claim accrues. ORS 12.010; ORS 12.110(1); *U.S. Nat'l Bank v. Davies*, 274 Or 663, 665-66, 548 P2d 966 (1976). With respect to legal malpractice claims, Oregon follows the "discovery" rule for establishing when a claim accrues. *Id.* at 666; *see Stephens v. Bohlman*, 314 Or 344, 349-50, 838 P2d 600 (1992) (discussing discovery rule in context of medical malpractice). The statute of limitations does not begin to run until the client knows or, in the exercise of reasonable care, should know " 'every fact which it would be necessary for the [client] to prove * * * in order to support his right to judgment.' " *U.S. Nat'l Bank v. Davies, supra*, 274 Or at 666-67 (quoting Franks, Limitations of Actions 11 (1959)). Thus, the claim accrues and the statute of limitations begins to run when the client both suffers damage and knows or, in the exercise of reasonable care, should know that " 'the substantial damage actually suffered *was caused* by' " the lawyer's acts or omissions. *Id.* at 670 (emphasis in original).

As often happens in the law, an appeal concerning one issue will turn on the resolution of another, separate issue. From the beginning, this has been an appeal involving whether the statute of limitations for the kinds of professional negligence alleged by plaintiff had run. But, in order to answer that question, it is necessary to determine what are the precise elements of an action for professional negligence (in this case, legal malpractice) for someone in plaintiff's position, so that one can determine when all those elements were discovered.

■ In the traditional legal malpractice action, as in other tort actions in which there is a special relationship between the plaintiff and the defendant, the plaintiff usually must allege and prove (1) a *duty* that runs from the defendant to the plaintiff; (2) a *breach* of that duty; (3) a resulting *harm* to the plaintiff measurable in damages; and (4) *causation, i.e.,* a causal link between the breach of duty and the harm. *See*

*Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 14-15, 734 P2d 1326 (1987) (discussing elements of negligence action in context of special relationship between plaintiff and defendant). Here, there is no issue as to the existence of a duty that defendant owed to plaintiff, the breach of that duty, or causation (all of which are assumed for purposes of this case). Rather, this is a case about *harm, i.e.,* about when plaintiff is deemed by the law to have suffered harm that may be attributed to defendant's alleged negligence. Determining precisely when plaintiff is deemed by the law to have suffered harm is the pivotal inquiry because, until he is deemed to have been harmed, that requisite element is missing, plaintiff has no claim that he could have brought against defendant and, therefore, the statute of limitations has not yet begun to run. *U.S. Nat'l Bank v. Davies, supra; see also Duyck v. Tualatin Valley Irrigation Dist.,* 304 Or 151, 163-64, 742 P2d 1176 (1987) (statute of limitations begins to run when plaintiff is aware, or should be aware, that he has been harmed and that there is a probable connection between the damages resulting from that harm and defendant's negligence).

■    When we speak of "harm," in the sense in which we will discuss it hereafter, we are referring to something more than the fact that a plaintiff has been convicted when he or she should not have been. Obviously, any such event is "harm," in the common meaning of that term, when it occurs. Rather, we are speaking of "harm" in the legal sense, *i.e.,* a collection of facts that the law is prepared to recognize as constituting the "harm" element of a claim for professional negligence. *See, e.g., Brennen v. City of Eugene,* 285 Or 401, 405, 591 P2d 719 (1979) (negligence claim requires *"legally cognizable* damage to plaintiff") (emphasis supplied).

■    Depending on the case, the question of when harm occurs may be a question of fact or a question of law. *Brown v. Babcock,* 273 Or 351, 355, 540 P2d 1402 (1975). In some cases, a court could conclude as a matter of law that no triable issue of fact exists as to when a client suffered harm from a lawyer's negligence. *See, e.g., U.S. Nat'l Bank v. Davies, supra,* 274 Or at 668 ("[t]here is no doubt that [the client's] necessity to defend [an action resulting from his lawyer's bad advice] caused him damage more than two years prior to the

commencement of the present action"). In other cases, only a trier of fact can determine when the client sustained harm that was caused by a lawyer's conduct. *See, e.g., Brown v. Babcock, supra* (jury properly determined, from conflicting evidence, when the client sustained harm from his lawyer's allegedly negligent defense of a property foreclosure action). For the reasons that follow, we conclude that the nature of plaintiff's claim makes this one of those cases in which it is appropriate for a court to determine that no triable issue of fact exists as to when the plaintiff suffered harm.

██ Legal malpractice is a common-law tort claim. In the absence of any pertinent legislation, it is for this court to define what constitutes legally cognizable harm in a tort case. The legislature has not addressed directly the question of when a person whose lawyer in a criminal case is guilty of professional negligence has been harmed for the purposes of a professional negligence action; this court therefore must do so. However, the failure of the legislature to address the specific question does not mean that the legislature has not provided general policy guidance bearing on our decision.

We refer to "policy," because the choice of what constitutes legally cognizable harm is a policy choice. In this case, the specific policy choice to be made is the following: When is a person who has been convicted of a criminal offense deemed to have been "harmed" by any negligence of defense counsel that the person alleges contributed to the person's conviction? In our view, the answer to that question is informed by the comprehensive legislative scheme that constitutes the substantive and procedural criminal law in Oregon.

Persons accused of criminal offenses in Oregon are afforded a wide range of procedural protections, many of which are derived from requirements of the Oregon and United States Constitutions. For example, one accused of a criminal offense is entitled to be represented by counsel, ORS 135.040, to be informed of the charge against the person, ORS 135.020, to be admitted to bail, ORS 135.230 *et seq*, to have reciprocal discovery of pertinent information, ORS 135.805 *et seq*, to be tried by a jury, ORS 136.001, and to have each element of the charge proved beyond a reasonable doubt, ORS 136.415. After conviction, the person is entitled to have a

pre-sentence investigation to determine an appropriate sanction, ORS 137.077, to be represented by counsel throughout the sentencing proceedings, ORS 137.071(4) (by implication), and to be heard personally before any sentence is passed, Or Const, Art I, § 11. Following sentencing, the person is entitled to take an appeal, ORS 138.020 and 138.040, and to be represented by counsel on appeal, ORS 138.480 *et seq.* Finally, with all other avenues of relief exhausted, the person is entitled to attack collaterally the conviction and sentence under Oregon's post-conviction relief law, ORS 138.510 *et seq,* on the ground, *inter alia,* that the person's counsel did not provide constitutionally adequate representation at trial or on appeal, ORS 138.530(1)(a).

The foregoing list is by no means exhaustive, but it does demonstrate that the legislature has seen fit to control very fully the criminal justice process from pre-trial proceedings through post-conviction relief proceedings, and to provide for nearly all conceivable contingencies that might arise as a case makes its way through that system. The list also demonstrates the legislature's intention that only those persons deserving of conviction will be, or will remain, convicted. But the elaboration and completeness of the scheme also appears to establish something else, *viz.,* that it is the public policy of this state to treat any person who has been convicted of any criminal offense as validly convicted unless and until the person's conviction has been reversed, whether on appeal or through post-conviction relief, or the person otherwise has been exonerated. Any policy choice that this court might make concerning when a person in plaintiff's position should be deemed to have been harmed by legal malpractice on the part of the person's criminal defense counsel should respect, and not hinder, the valid policy choices already made by the legislature.

Respecting the legislature's comprehensive criminal justice construct means, at a minimum, that it is inappropriate to permit a person who has been convicted of a criminal offense to assert in the courts a claim for legal malpractice in connection with that conviction unless and until the person has challenged successfully the conviction through the direct appeal or post-conviction processes now provided by Oregon

law, or the person otherwise has been exonerated of the offense.

There are several reasons for adopting the foregoing rule. The first has to do with the nature of any legal malpractice claim that would be brought in cases like this one. The gravamen of such a claim will be that plaintiff's criminal defense counsel failed in some way to perform counsel's obligations in accordance with the standards of the legal community. But the nature and extent of counsel's obligations in this specialized area of the law are matters of constitutional import that have been the subject of many decisions both by this court and by the Supreme Court of the United States. Cases illustrating the principles involved are *Strickland v. Washington*, 466 US 668, 687-88, 104 S Ct 2052, 80 L Ed 2d 674 (1984) (counsel must provide "reasonably effective assistance * * * under prevailing professional norms * * * considering all the circumstances"), and *Krummacher v. Gierloff*, 290 Or 867, 872, 627 P2d 458 (1981) (counsel must give "adequate performance * * * of those functions of professional assistance which an accused person relies upon counsel to perform on his behalf"). Moreover, those constitutional standards specifically are supposed to be vindicated by proceedings under Oregon's post-conviction relief law. *See Krummacher v. Gierloff, supra*, 290 Or at 869 (illustrating process). In view of the extensive statutory provisions already in place for the protection of convicted offenders, we think that it would be inappropriate to treat victims of alleged negligence by defense counsel as having been "harmed," for the purpose of maintaining a legal malpractice action in cases like this, unless they show that their counsel failed to meet the established standards in a way that would make post-conviction relief appropriate.

A second consideration has to do with the nature of a criminal conviction. In our society, no other legal outcome of the trial process is so difficult to obtain. Yet, to allow a person convicted of a criminal offense to sue that person's lawyer without having first overturned the conviction would mean that the courts would be permitting relitigation of a matter that is supposed to be settled: The complaining party is deemed by the law to be guilty. The panoply of protections accorded to the criminally accused (including direct appeal

and post-conviction relief) is so inclusive, and the significance of a conviction so important to vindication of the rule of law, that it would appear most unusual to permit a person to prosecute a legal malpractice action premised on some flaw in the process that led to that person's conviction at the same time that the person's conviction remained valid for all other purposes. In other words, while the conviction and sentence remain valid for all other purposes, it is inappropriate to treat a complaining convicted offender as having been "harmed" in a legally cognizable way by that conviction.

At least one other consideration is pertinent. However a person comes to be convicted — whether by a plea to the charge, through a plea agreement, or after a trial to judge or jury — for the purposes of a case like this one, the person convicted is deemed equally guilty. Many prisoner complaints in this area will relate to the failure of counsel to get a "better deal" for the accused. But many "better deals" will relate to terms of a sentence or of probation. Such complaints would not result in a reversal of a conviction, either outright or for a new trial. It is only in these latter circumstances, however, that a legal malpractice action will be available. Although a plaintiff may wish that he or she had gotten a better deal, we do not consider it appropriate, outside of circumstances where the kind of relief that we have described is available under the post-conviction relief law, to treat a convicted offender as having been caused "harm" in a legally cognizable way by any disposition of that person's case that was legally permissible.

There is considerable case law that supports the result that we announce here, although it is by no means uniform in its analysis or rationale. There also is a body of case law to the contrary. We mention a few cases of both species in passing.

The leading cases that require successful post-conviction relief proceedings, or some other allegation of innocence of the underlying charge, come from Alaska, New York, and Massachusetts. We discuss them in that order.

In *Shaw v. State, Dept. of Admin., PDA*, 816 P2d 1358 (Alaska 1991), the plaintiff and a codefendant on a theft

charge had been represented by a single lawyer. The codefendant insisted that the plaintiff was innocent and was willing to testify to that effect. Counsel, in order to protect the interests of the codefendant, refused to let the codefendant testify. The plaintiff was convicted. Several years later, the plaintiff finally received post-conviction relief and a reversal of his conviction on the theft charge due to the constitutional inadequacy of his counsel's representation. He then brought a malpractice action against his former counsel. As was true in the present case, the plaintiff's former counsel interposed the statute of limitations. A trial judge agreed and dismissed the case. On appeal, the Supreme Court of Alaska reversed. The court stated:

> "We hold that a convicted criminal defendant must obtain post-conviction relief before pursuing an action for legal malpractice against his or her attorney. Given that obtaining such relief will remain uncertain until actually granted, the statute of limitations for filing legal malpractice claims must be tolled until such relief is granted.

> "Our review of the case law reveals that other jurisdictions are divided on the issue of requiring post-conviction relief for maintaining a legal malpractice action in a criminal case. However, we agree with those courts which have held that public policy requires some form of post-conviction relief as a prerequisite to the filing of a legal malpractice claim."

*Id.* at 1360 (footnote omitted). Among the justifications for this approach, the court listed judicial economy (because many of the issues litigated in the malpractice action will be the same as those involved in a post-conviction proceeding, and they will be relevant both to causation and damages); the possible availability of issue or claim preclusion to bar further litigation, if the post-conviction proceeding is unsuccessful; and the fact that requiring a successful post-conviction proceeding creates a "bright line" for determining when the pertinent statute of limitations begins to run. *Id.* at 1361. The court also expressed concern about " 'the litigious nature of incarcerated persons who occupy the time of their incarceration by pursuing civil actions against their former attorneys.' " *Id.* (quoting 2 Mallen and Smith, Legal Malpractice 290, § 21.3 (3d ed 1989)).

Although the rule that it announced benefited the plaintiff in the case before it, the Alaska court acknowledged that, as a general matter, requiring a successful post-conviction proceeding before the legal malpractice action could be brought might appear to impose a higher burden on the allegedly wronged criminal defendant than the burden faced by a similarly wronged civil litigant. We agree with the court's answer to that concern:

" '[T]here is minimal unfairness in such a requirement since the ability to have a judgment set aside because of the incompetence of counsel is a remedy uniquely available to criminally convicted persons. The civil litigant has no such remedy.' "

*Id.* at 1361-62 (quoting 2 Mallen and Smith, *supra*, at 291).

In *Carmel v. Lunney*, 70 NY2d 169, 518 NYS2d 605, 511 NE2d 1126 (1987), the plaintiff had pleaded guilty to a misdemeanor securities law violation. In an ensuing malpractice action, the plaintiff alleged that his counsel had failed to advise him of potential conflicts of interest and of the potentially incriminating effect of the plaintiff's testimony at an administrative hearing. At the time that he brought the malpractice action, the plaintiff had not successfully challenged his underlying conviction; that, the New York Court of Appeals held, was fatal to his claim. The court stated:

"To state a cause of action for legal malpractice arising from negligent representation in a criminal proceeding, plaintiff must allege his innocence or a colorable claim of innocence of the underlying offense [citation omitted], for so long as the determination of his guilt of that offense remains undisturbed, no cause of action will lie. Here, because plaintiff's conviction * * * has not been successfully challenged, he can neither assert, nor establish, his innocence. He has thus failed to state a cause of action * * *.

"* * * [B]ecause he cannot assert his innocence, public policy prevents maintenance of a malpractice action against his attorney. This is so because criminal prosecutions involve constitutional and procedural safeguards designed to maintain the integrity of the judicial system and to protect criminal defendants from overreaching governmental actions. These aspects of criminal proceedings make criminal malpractice cases unique, and policy considerations require different pleading and substantive rules (*see, e.g.*, Kaus and

Mallen, *The Misguiding Hand of Counsel — Reflections on 'Criminal Malpractice'*, 21 UCLA L Rev 1191 [1974])."

70 NY2d at 173-74. We agree particularly with the New York court's emphasis on the unique nature of a criminal conviction as a source of alleged harm justifying a legal malpractice action.

In *Glenn v. Aiken*, 409 Mass 699, 569 NE2d 783 (1991), the Supreme Judicial Court of Massachusetts went so far as to require that a former criminal defendant prove, not simply his successful overturning of an underlying conviction, but his actual innocence of the underlying charge as an element of a legal malpractice claim against his former defense counsel. In that case, the plaintiff had been convicted of arson, but his conviction was overturned on appeal due to an incorrect jury instruction. The plaintiff's trial counsel (the defendant in the malpractice action) had not objected to the improper instruction. The commonwealth chose not to retry the plaintiff. The court placed special emphasis on the differences in burdens of proof between civil and criminal cases, as well as on "public policy considerations" suggesting that it was undesirable for criminal defense counsel to be placed in a position that virtually required them to reveal the secrets of their former clients in defending against a legal malpractice claim. 409 Mass at 706-07.

Cases from other jurisdictions have reached similar results. *See, e.g., Hines v. Davidson*, 489 So 2d 572 (Ala 1986) (requiring that the plaintiff allege that, but for his lawyer's negligence, he would have been acquitted of underlying charge); *Schlumm v. O'Hagan*, 173 Mich App 345, 355-56, 433 NW2d 839 (1988) (defense counsel may rely on issue preclusion based on prior judicial rejection of claim of ineffective assistance of counsel), *appeal denied* 433 Mich 855 (1989); *Johnson v. Raban*, 702 SW2d 134, 137-38 (Mo App 1985) (prior judicial determination that defense counsel was not ineffective precluded later malpractice action, because standard for measuring counsel's performance was same in both cases); *Alberici v. Tinari*, 374 Pa Super 20, 542 A2d 127, 131-32 (1988) (same); *McCord v. Bailey*, 636 F2d 606 (DC Cir 1980) (summary judgment for defendant defense counsel upheld where the plaintiff's conviction on the underlying criminal charge had not been reversed on appeal or in post-

conviction proceedings), *cert den* 451 US 983 (1981); *Weiner v. Mitchell, Silberberg & Knupp*, 114 Cal App 3d 39, 48, 170 Cal Rptr 533 (1980) (the plaintiff's damages were caused by his guilt of the underlying offense, not by negligence of counsel).

The foregoing cases do not (as we noted earlier) employ similar reasoning for reaching their similar results. Although we believe that the reasons that we have advanced in our own opinion in this case are bolstered by those cases cited from other jurisdictions, we consider our own list of reasons to be better focused on the underlying theoretical considerations involved.

The strongest case that we have been able to find in opposition to the position that we adopt today is *Jepson v. Stubbs*, 555 SW2d 307 (Mo 1977). In that case, the plaintiff brought a malpractice action against a lawyer who had represented him on a charge of refusing to submit to induction into the military service. A federal court later set aside the plaintiff's conviction on the underlying charge. The plaintiff's former counsel asserted Missouri's statute of limitations as a defense. The Supreme Court of Missouri held that the statute had been tolled only so long as the plaintiff was subject to "civil death" under Missouri law. The effect of that ruling was to bar the plaintiff's action. The plaintiff argued, *inter alia*, that the pertinent date should be the date on which his underlying conviction was set aside. The court specifically rejected that argument, explaining:

> "We conclude that it was not a condition to maintaining that suit that the judgment of conviction be set aside. A hypothetical example will illustrate. Suppose that plaintiff in this suit had been sued for damages for negligent conduct in operating his car and defendant attorney advised him that he had no defense and should confess judgment. Suppose further that plaintiff followed his attorney's advice and confessed judgment and then paid it. Assume finally that it developed subsequently that the attorney had not investigated the facts or the law and was clearly wrong in his advice. The confession of liability and the resulting judgment would at least imply a finding that defendant knowingly recognized and admitted his negligence and his liability. However, contrary to plaintiff's theory regarding collateral estoppel, it would not be a

condition to a suit against the attorney that plaintiff some-how have set aside the prior judgment finding him negligent and liable in damages. Plaintiff could sue [the attorney] based on his negligent conduct and would not be collaterally estopped from bringing the suit by the judgment that he was negligent and liable to the one who sued him. If plaintiff in this hypothetical situation could prove to the jury that the attorney negligently represented and advised him and that he relied thereon and confessed judgment based on the attorney's advice, he would have proved that which would be necessary for him to recover."

*Id.* at 313-14.

The Missouri court's decision gives no hint that it considered whether questions such as the nature of the harm suffered by a convicted criminal defendant or the comprehensive nature of the criminal justice process justified thinking about a different analysis. Neither does the Missouri court's opinion recognize that, unlike the situation in the civil case that it posited, a convicted defendant in a criminal case has specific statutory avenues for setting aside a judgment if defense counsel fails to perform in a constitutionally adequate manner. Because of those deficiencies in its analysis of the framework in which cases like this arise, we do not find *Jepson* persuasive.

A more interesting case is *Krahn v. Kinney*, 43 Ohio St 3d 103, 538 NE2d 1058 (1989). In that case, the plaintiff had been charged with three illegal gambling misdemeanors. The lawyer who represented her had a conflict of interest such that, when the prosecutor told the defense counsel that the plaintiff could have the charges against her dismissed in return for testimony against another party, the lawyer (who secretly represented the other party) did not pass the offer on to the plaintiff. The plaintiff then was persuaded by defense counsel to plead to one of the charges in exchange for dismissal of two others. On learning the true state of facts, the plaintiff brought a malpractice action without first managing to have her underlying conviction set aside.[4]

---

[4] Krahn apparently sought to have her conviction set aside, but a trial court refused to do so, and Krahn did not appeal.

Like the Supreme Court of Missouri, the Supreme Court of Ohio in *Krahn* analogized to civil actions in holding that it was not necessary that the plaintiff plead that she was innocent of the underlying charge. It was enough to establish a claim, the court held, that plaintiff had " 'lost [an] opportunity to minimize her criminal record.' " 43 Ohio St 3d at 106 (quoting from the opinion in the same case in the Ohio Court of Appeals).

The opinion in *Krahn* provokes several comments. The first is that, as was true in *Jepson*, the Ohio court did not consider the meaning of the availability of a post-judgment form of relief. The second is that, to the extent that the opinion can be understood as recognizing the "although I may be guilty, I could have gotten a better deal" school of legal malpractice in the criminal law area, we simply disagree that such civil legal actions should be possible. And, finally, we note that the kind of defalcation alleged to have been committed by the plaintiff's counsel in *Krahn* would certainly have permitted Krahn to have her conviction set aside, had the same events occurred in Oregon. Thus, on its own facts, and assuming a properly functioning judicial process, a person in Krahn's position would have been able, after her conviction was set aside, to bring a malpractice action under the rule that we announce in this case.

As was true with respect to the *Jepson* opinion, we believe that the Ohio court's opinion in *Krahn* focused on the wrong questions and missed what are, in our view, the more pertinent ones.

■        We hold that, in order for one convicted of a criminal offense to bring an action for professional negligence against that person's criminal defense counsel, the person must, in addition to alleging a duty, its breach, and causation, allege "harm" in that the person has been exonerated of the criminal offense through reversal on direct appeal, through post-conviction relief proceedings, or otherwise. We turn now to application of the foregoing standard to the facts of this case.

■        Defendant argues that plaintiff's claim accrued and the statute of limitations began to run on March 31, 1987, when plaintiff entered his no-contest plea. At that time, defendant argues, plaintiff was both harmed and dissatisfied

with defendant's representation. Our previous discussion of the elements of a professional negligence action brought in circumstances like these demonstrates defendant's error. Plaintiff could not have brought this action until he had suffered legally cognizable harm. *See U.S. Nat'l Bank v. Davies, supra,* 274 Or at 668 (claim may not be brought before the "maturation of harm"). Plaintiff had not suffered such harm at defendant's hands in this case unless and until he was exonerated of the criminal offense through reversal on direct appeal, through post-conviction relief proceedings, or otherwise. Here, he legally was exonerated by a means that qualifies as "otherwise." But the date of that exoneration — the date on which his conviction was set aside and he was released — was well within two years of the date on which the present action was filed. The trial court's ruling that the harm had occurred more than two years before the complaint was filed therefore was error.

The foregoing demonstrates that the Court of Appeals' disposition of this case also was incorrect. There is no disputed question of material fact remaining with respect to when plaintiff could first have filed the present action. The action is timely; it must be defended on the merits.

The decision of the Court of Appeals is affirmed on different grounds. The judgment of the circuit court is reversed in part. The case is remanded to the circuit court for further proceedings.

**UNIS, J.,** specially concurring

Although the majority holds for plaintiff in this case, I believe that plaintiff and other persons convicted of a crime will be astonished to learn that, even if their lawyers' negligence resulted in their being wrongly convicted and imprisoned, they were not harmed when they were wrongly convicted and imprisoned but, rather, that they are harmed only if and when they are exonerated. *See* 316 Or at 223, 238. Such persons will be no less astonished because of the majority's insistence that its rule is simply a legal definition of harm (*i.e.*, a legal fiction). Such attempts to divorce the law from reality should be avoided.

## I. SUMMARY JUDGMENT FOR DEFENDANT WAS NOT PROPER

The majority holds:

> "[I]n order for one convicted of a criminal offense to bring an action for professional negligence against that person's criminal defense counsel, *the person must,* in addition to alleging a duty, its breach, and causation, *allege 'harm' in that the person has been **exonerated** of the criminal offense through reversal on direct appeal, through post-conviction relief proceedings, or otherwise.*" 316 Or at 238 (emphasis added).

Before I address what I perceive to be serious defects in the majority's "no-exoneration/no-harm" rule, I will set out what I believe is the proper legal analysis and application in this case. In my view, this court should simply hold that summary judgment for defendant was not proper in this case, because there are genuine issues of material fact as to when plaintiff was harmed by defendant's alleged negligence and when plaintiff knew or should have known that defendant's alleged negligence caused his harm.

The majority correctly states the basic components of a claim for professional negligence:

> "A claim for professional negligence in the form of legal malpractice must be commenced within two years of the date on which the claim accrues. ORS 12.010; ORS 12.110(1); *U.S. Nat'l Bank v. Davies,* 274 Or 663, 665-66, 548 P2d 966 (1976). With respect to legal malpractice claims, Oregon follows the 'discovery' rule for establishing when a claim accrues. *Id.* at 666; *see Stephens v. Bohlman,* 314 Or 344, 349-50, 838 P2d 600 (1992) (discussing discovery rule in context of medical malpractice). The statute of limitations does not begin to run until the client knows or, in the exercise of reasonable care, should know ' "every fact which it would be necessary for the [client] to prove * * * in order to support his right to judgment." ' *U.S. Nat'l Bank v. Davies, supra,* 274 Or at 666-67 (quoting Franks, Limitations of Actions 11 (1959)). Thus, the claim accrues and the statute of limitations begins to run when the client both suffers damage and knows or, in the exercise of reasonable care, should know that ' " the substantial damage actually suffered *was caused* by" ' the lawyer's acts or omissions. *Id.* at 670 (emphasis in original).
>
> "* * * * *

"In the traditional legal malpractice action, as in other tort actions in which there is a special relationship between the plaintiff and the defendant, the plaintiff usually must allege and prove (1) a *duty* that runs from the defendant to the plaintiff; (2) a *breach* of that duty; (3) a resulting *harm* to the plaintiff measurable in damages; and (4) *causation, i.e.*, a causal link between the breach of duty and the harm. *See Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 14-15, 734 P2d 1326 (1987) (discussing elements of negligence action in context of special relationship between plaintiff and defendant)." 316 Or at 227-28 (emphasis in original).

The broad issue in this case is whether, as a matter of law, plaintiff's cause of action against defendant for professional legal negligence accrued more than two years before April 24, 1989, the date on which plaintiff filed his complaint. There is no question that a lawyer-client relationship existed between plaintiff and defendant before April 24, 1987. Similarly, it is not disputed that defendant's breach of duty to plaintiff, if it occurred at all, would have occurred before April 24, 1987. There are, however, two disputed factual questions in determining when the statute of limitations began to run in this case: (1) when plaintiff was harmed and (2) when plaintiff knew or should have known that his lawyer's negligence caused his harm. Thus, the specific issue is whether plaintiff both suffered harm *and* knew or should have known that defendant's alleged conduct was the cause of that harm more than two years before April 24, 1989.

Defendant argues that plaintiff's claim accrued and the statute of limitations began to run on March 31, 1987, when plaintiff entered his no-contest plea. At that time, defendant argues, plaintiff was both harmed and dissatisfied with defendant's representation.

Plaintiff responds with four alternative arguments to support his contention that his action was timely filed. First, plaintiff argues that his claim could not have accrued before July 8, 1987, the day that he was convicted and sentenced, because he suffered no harm until the trial court entered a judgment of conviction. Second, plaintiff argues that, under the doctrine of "continuous representation,"[1]

---

[1] The purpose of the continuous representation rule is to avoid unnecessarily disrupting the lawyer-client relationship and to enable the lawyer to correct or avoid

under which the statute of limitations does not begin to run until the lawyer's representation concerning a particular transaction is terminated, the claim could not have accrued before July 8, 1987, the date that defendant's representation of plaintiff ceased. Third, plaintiff argues that a claim for legal malpractice arising from the lawyer's defense of a client convicted of a crime does not accrue unless and until the client's conviction is reversed; in this case, plaintiff's conviction was vacated on April 27, 1988.[2] Fourth, plaintiff argues that the statute of limitations did not begin to run until May 21, 1988, the date on which he first consulted another lawyer after his release from prison. It was on that date, plaintiff asserts, that he first knew or, in the exercise of reasonable care, should have known that defendant's negligence was a cause of his harm.

Defendant argues that, as a matter of law, plaintiff was harmed on the date that he entered his no-contest plea, because plaintiff knew at that time that he probably would go to prison. That argument is not convincing. Generally, a threat of future harm not yet realized is not sufficient damage to start the running of the statute of limitations.[3] *U.S. Nat'l Bank v. Davies, supra*, 274 Or at 668. Moreover, although it may be true that in some circumstances a person is harmed at the time of entering a no-contest plea, I am not convinced

the consequences to the client of an apparent error. 2 Mallen and Smith, Legal Malpractice 113, § 18.12 (3d ed 1989). The rule originates from the "continuous treatment doctrine" in medical malpractice actions. In *Shives v. Chamberlain*, 168 Or 676, 685, 126 P2d 28 (1942), this court held that, where there is continuous medical treatment, the statute of limitations should not begin until the treatment by the doctor was discontinued. *Accord, Hotelling v. Walther*, 169 Or 559, 563, 130 P2d 944 (1942). Although the doctrine of continuous representation has received general judicial acceptance in professional legal negligence cases in other jurisdictions, 2 Mallen and Smith, *supra*, at 116, §18.12, it has not yet been adopted in that context in Oregon.

[2] This argument was raised for the first time in this court in response to questions posed by members of the court during oral argument.

[3] At any time before judgment, the trial court is permitted to withdraw the plea of no contest and substitute a plea of not guilty. ORS 135.365. "A defendant may plead no contest only with the consent of the court." ORS 135.335(2). The court is not required to accept the plea of no contest if, for example, the court believes that there is not sufficient evidence to support a finding that the defendant is guilty beyond a reasonable doubt. Rather, "a plea [of no contest] shall be accepted by the court *only* after due consideration of the views of the parties and the interest of the public in the effective administration of justice." ORS 135.335(2) (emphasis added).

under the facts of this case that harm occurred at that moment as a matter of law.

Defendant also argues that by March 31, 1987, the date of plaintiff's no-contest plea, plaintiff had begun to suffer some of his claimed damages of humiliation, embarrassment, loss of reputation, anxiety, and employment termination. Defendant produced no evidence to support the argument that plaintiff was suffering those kinds of claimed damages *at the time of* plaintiff's no-contest plea.[4] Moreover, it is not clear whether any such damages that plaintiff may have suffered by the date of his no-contest plea were caused by defendant's alleged negligent conduct.

To warrant summary judgment, the moving party (in this case, defendant) must show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Seeborg v. General Motors Corporation*, 284 Or 695, 699, 588 P2d 1100 (1978). "It is not the function of this court on review to decide issues of fact, but solely to determine if there is an issue of fact to be tried." *Forest Grove Brick v. Strickland*, 277 Or 81, 87, 559 P2d 502 (1977). In reviewing a trial court's ruling on a motion for summary judgment, this court views the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the non-moving party (in this case, plaintiff). *Seeborg v. General Motors Corporation, supra*, 284 Or at 699. Applying those principles, defendant was not entitled to summary judgment. The record discloses an unresolved factual question as to when plaintiff suffered harm that was caused by defendant's alleged breach of duty. In this case, there is a genuine issue of material fact as to when defendant's alleged negligence caused plaintiff to sustain actual damage, *i.e.*, whether defendant's alleged negligence caused plaintiff to suffer actual harm less than two years before plaintiff's complaint was filed.

---

[4] Defendant produced evidence that plaintiff was unemployed for several months before he entered his no-contest plea. In defendant's reply to plaintiff's memorandum in opposition to defendant's motion for summary judgment, defendant provided evidence that on November 19, 1986, plaintiff lost a job due to poor attendance. This presents an unresolved factual question for the jury as to whether plaintiff's loss of that job was caused by defendant's alleged negligence and, if so, whether that damage was sufficient to commence the running of the statute of limitations.

Even if we assume, *arguendo*, that plaintiff suffered harm on the date that he entered his no-contest plea, as defendant asserts, the statute of limitations does not begin to run until plaintiff knew or, in the exercise of reasonable care, should have known that defendant's alleged acts or omissions were the cause of his harm. *See U.S. Nat'l Bank v. Davies, supra*, 274 Or at 666-68 (stating principle). The Court of Appeals held that, "[b]ecause plaintiff believed that he would have been convicted anyway, he could not have then known [at the time he entered his no-contest plea] that defendant's allegedly negligent representation caused him any harm." *Stevens v. Bispham*, 108 Or App 588, 594, 816 P2d 700 (1991). Defendant argues the opposite — that plaintiff *did* know at the time of his plea that defendant's representation was negligent.

Although the statute of limitations is not suspended for a plaintiff to learn that a defendant's conduct is "culpable," *Duyck v. Tualatin Valley Irrigation Dist.*, 304 Or 151, 163-64, 742 P2d 1176 (1987), the statute does not begin to run until plaintiff knows or should know of a probable causal connection between defendant's conduct and plaintiff's harm. The knowledge that it appears probable that the substantial damage actually suffered was caused by defendant's conduct is sufficient to commence the limitation period. *U.S. Nat'l Bank v. Davies, supra*, 274 Or at 670.

The issue of when discovery occurred (*i.e.*, when the plaintiff knew or should have known that his lawyer's negligence caused him harm) can be decided as a matter of law where the pleadings establish that the plaintiff had a general awareness of the defendant's misconduct, which awareness pre-existed the statutory limitations period. *See, e.g., Jaquith v. Ferris*, 297 Or 783, 687 P2d 1083 (1984) (evidence showed that the plaintiff knew more than two years before she filed the action that the defendant affirmatively had misrepresented the value of her property). Typically, however, it is a question of fact as to whether the plaintiff (client) knew or should have known of the lawyer's negligent acts or omissions and that they caused him harm.

In this case, defendant relies solely on plaintiff's deposition testimony. Plaintiff stated that he was not satisfied with defendant's representation when he pleaded no

contest, because plaintiff knew that he was going to prison even though he was innocent.[5] Defendant argues that plaintiff's deposition testimony conclusively proves that plaintiff knew at the time he entered his plea that defendant's alleged negligence was the cause of his harm.

Plaintiff's deposition testimony must be viewed in conjunction with his statement to the trial court at his plea hearing that he *was satisfied* with the help that defendant had provided.[6] Viewing the evidence with all reasonable inferences in favor of plaintiff, plaintiff's deposition testimony does not show as a matter of law that plaintiff knew at the time of his plea that defendant's alleged conduct had caused him harm. Plaintiff's deposition testimony arguably indicates nothing more than that, at the time that plaintiff entered his plea, plaintiff knew that, despite his innocence of the criminal charges, he was probably going to prison. One reasonable construction of plaintiff's deposition testimony is that it reveals plaintiff's vague sense of unease and dissatisfaction with his lawyer (defendant) and with the predicament in which he found himself. Plaintiff's knowledge of his innocence and his dissatisfaction with his predicament is not

---

[5] Plaintiff's deposition reads, in part:

"Q: At the time you entered the plea of no contest in front of the judge, were you satisfied with the help that [defendant] had given you?

"A: No. I wasn't really.

"Q: Why weren't you?

"A: Because I was going to be leaving my family.

"Q: Because you knew you were going to have to go to prison?

"A: I—yes.

"Q: And how did that relate to [defendant]? What did you think he should have done that he didn't do?

"A: Well, investigation.

"Q: What kind of investigation?

"A: I don't know what — what kind of procedures that they do. I don't know.

"Q: Well, can you give me any idea what you thought [defendant] should have done?

"A: Not —

"Q: That he didn't do?

"A: No, I don't."

[6] On March 31, 1987, at the hearing on plaintiff's plea, the trial court asked plaintiff, "Are you satisfied with the help your attorney has given you?" Plaintiff responded, "Yes, I am."

the same as knowledge that his lawyer's negligent conduct *caused* him harm and is not sufficient as a matter of law to start the running of the statute of limitations. The fact that an innocent person is wrongly convicted of a crime does not necessarily mean that the lawyer's allegedly defective representation caused that conviction. Plaintiff cannot be presumed to have known that his lawyer provided inadequate representation just because he knew that he was innocent and yet he was convicted.

There is no evidence that plaintiff knew what investigation or legal research that defendant had or had not done when he advised plaintiff to plead no contest. There is no evidence that plaintiff knew of *any* of defendant's acts or omissions that plaintiff now claims constitute negligence. For example, there is no evidence that plaintiff knew that defendant had not interviewed the three victims, had not inspected the scene of the crimes, and had not interviewed all possible alibi witnesses. Plaintiff did not know that defendant had not requested an in-person lineup and that the victim who had identified him in a photograph would have said positively after an in-person viewing that he was not the offender. Plaintiff did not know that the trial court had authorized investigative expenses and that defendant had unilaterally chosen not to use them. Plaintiff did not know that the district attorney had told defendant that plaintiff's prior conviction for indecent exposure would not have been offered against plaintiff at trial. Plaintiff did not know that his lawyer was wrong in his opinion that the polygraph test likely would be admissible against plaintiff. Plaintiff did not know that there were other significant differences between the evidence supposedly linking him to the crimes and the victims' descriptions of the crimes.

Resolution of the issue of when plaintiff discovered that defendant's acts and omissions had caused him harm presents a genuine issue of material fact. The question of when defendant's alleged misconduct would have been discoverable by reasonable diligence also usually raises an issue of fact. *See Forest Grove Brick v. Strickland, supra,* 277 Or at 86-87. In this case, it cannot be said as a matter of law that defendant's alleged deficiencies in his defense of plaintiff

should have been discovered by plaintiff with reasonable diligence more than two years before plaintiff filed this action.

It was error, therefore, for the trial court to conclude that, as a matter of law, plaintiff either knew or should have known, more than two years before he filed this action, that defendant's conduct caused his harm. For the reasons stated above, the Court of Appeals' reversal of the trial court's grant of summary judgment for defendant should be affirmed.

## II. THE MAJORITY'S "NO-EXONERATION/NO-HARM" RULE IS CONTRARY TO LEGISLATIVE DIRECTIVES AND INTENT RELATING TO THE STATUTE OF LIMITATIONS

It is also error, however, for the majority to craft the "no-exoneration/no-harm" rule that effectively grants partial summary judgment to plaintiff in the course of reversing the trial court's summary judgment for defendant. It is to that point that I now turn.

In its insistence on reaching out and building an analysis for situations that we do not confront in this case, *i.e.*, for situations in which a conviction *has not* been overturned, the majority has applied that analysis to the one type of case in which that analysis perhaps is most clearly wrong — the case in which a conviction *has* been overturned. Statutes of limitations define when an action is barred due to the passage of an excessive period of time from the accrual of the cause of action. Statutes of limitations are designed to promote stability in the affairs of persons and to avoid the unfairness and burdens inherent in defending stale claims. *Johnson v. Star Machinery Co.*, 270 Or 694, 700-01, 530 P2d 53 (1974). The majority's "no-exoneration/no-harm" rule interferes with those objectives. Under the majority's rule, the running of the statute of limitations does not depend on how long it has been since the lawyer committed negligence, does not depend on how long it has been since the negligence caused a person to be convicted, and does not depend on how long it has been since the person knew that the lawyer's negligence caused the conviction. According to the majority, as long as a claim is brought within two years of plaintiff's exoneration of the criminal offense through reversal on direct

appeal, through post-conviction relief proceedings, or otherwise, 316 Or at 223, 238, it is timely, because the claim does not accrue and the statute of limitations does not begin to run until that point.[7] Under the majority's "no-exoneration/no-harm" rule, claims by convicted persons for legal malpractice may never be stale, because exoneration of the criminal offense through reversal or vacation after one month or after three decades may suddenly cause the claim to accrue.[8]

---

[7] Although it may be unusual for a defendant to be exonerated of the criminal offense other than by a reversal on direct appeal or through post-conviction relief proceedings filed within 120 days of conviction, such an exoneration was achieved in this case and has no time limitations. Although such an exoneration may be rare, the majority's link between harm and exoneration means that there may be no limit on how long criminal defense lawyers must be prepared to defend a claim for legal malpractice in defending a person who has been convicted of a crime. According to the majority, as long as a conviction is valid, and even if everyone knows about the criminal defendant's lawyer's negligence, the claim for legal malpractice has not even accrued; it could accrue at any time with no time limitations, and the criminal defense lawyer would then have to defend it.

Specifically, a convicted person potentially can be exonerated of the criminal offense at any time if, for example, another person confesses (as happened in this case) or other evidence appears "which could not easily have been raised" earlier and the conviction is set aside, ORS 138.510(2), or the person is exonerated by a Governor's pardon, ORS 144.650, or a person is otherwise exonerated, and suddenly the claim for legal malpractice accrues and the two-year statute of limitations begins to run. Not even the length of a sentence is a limitation, because a conviction could be vacated or a pardon granted even after a person has served the full length of a sentence and has been released. The majority prevents the claim from even accruing before the convicted person is exonerated; if there are any restrictions on the statute of limitations automatically beginning to run at any point in the future that the person is exonerated, the majority's rule would prevent the legislature's two-year statute of limitations from ever beginning or the claim from ever accruing. In that case, under the majority's legal fiction defining harm, the convicted person would never be considered harmed, no matter how clear it has become that the lawyer's negligence caused the person to be convicted and wrongly imprisoned.

In my view, it makes much more sense to give a realistic definition of harm, to adhere to the discovery rule for the purpose of determining when the statute of limitations begins to run, and to allow convicted persons, just like anyone else with a potential negligence claim, two years from the date the person suffered harm and knew or should have known that the harm was caused by the lawyer's negligence to file the claim. *See supra*, Part I. It then may be that in a particular case a convicted person did not know that the lawyer's negligence caused the harm until the person is exonerated, but that does not prevent the claim from accruing earlier if the person did know earlier. Further, the statute of ultimate repose, ORS 12.115(1), provides a limitation on the action, which makes sense in this context where the cause of action has not been prevented from running by a court-made rule that undermines the legislative system. *See infra*, note 8.

[8] It is not clear what relation the majority's "no-exoneration/no-harm" rule will have to the statute of ultimate repose, ORS 12.115(1), which provides that "[i]n no event shall any action for negligent injury to person or property of another be commenced more than 10 years from the date of the act or omission complained of."

The more appropriate rule under existing law, and the rule consistent with professional negligence claims generally, is that a claim for legal malpractice arising from a lawyer's defense of a client in a criminal case accrues and the two-year statute of limitations begins to run when the client suffered harm and knew or should have known that the harm was caused by the client's lawyer's negligence. Thus, if plaintiff both was harmed and knew or should have known that the harm was caused by defendant's negligence more than two years before bringing the action against defendant, the statute of limitations would bar the action. Those questions (*i.e.*, when plaintiff was harmed and when plaintiff knew or should have known that defendant's negligence was the cause of that harm) present genuine issues of material fact in this case, as I discussed in Part I. Summary judgment for defendant, therefore, was not appropriate.

Ironically, while the majority's "no-exoneration/no-harm" rule leaves criminal defense lawyers open to the interminable possibility of being sued by any convicted client who has not been exonerated but who, theoretically, could be exonerated at any future time, the majority's rule also has the practical effect of severely limiting the time available in which a convicted person must act to preserve a legal malpractice claim against a criminal defense lawyer. That is, the majority's rule effectively limits the legislature's *two-year* statute of limitations for legal malpractice claims relating to a lawyer's defense of a client in a criminal case by effectively requiring the plaintiff to do something not required by the legislature within *120 days* in order to preserve the claim. As previously stated, the majority announces that there is no harm until the person "has been exonerated of the criminal offense through reversal on direct appeal, through post-conviction relief proceedings, or otherwise." 316 Or at 223, 238. In order to reverse a conviction, a direct appeal normally must be commenced by filing a notice of appeal "not later

---

On the one hand, the "act" occurred at the time of representation, but the majority is interfering with the legislative system by making it impossible in many instances for a criminal defendant to bring an action during the time in which the legislature contemplated that the statute of ultimate repose would be running. If, under the majority's rule, the statute of ultimate repose serves to limit claims, the majority has, in many instances, effectively eliminated such claims and has modified the statute of limitations enacted by the legislature.

than 30 days after the judgment or order appealed from was entered in the register." ORS 138.071. For all practical purposes, the other way to set aside a conviction is through a petition for post-conviction relief, which, where no direct appeal is taken,[9] must be filed within 120 days of the date the judgment of conviction is entered.[10] ORS 138.510(2)(a).

A criminal defendant (innocent or otherwise) may not be aware that the lawyer's negligence contributed to or caused the conviction, even if the negligence is such that the criminal defendant should have been aware of it immediately. The criminal defendant may decide not to challenge the conviction within the 30- and 120-day limitation periods[11] because, while the conviction is wrong, the criminal defendant does not know of any legitimate legal ground on which to seek exoneration of the criminal offense through reversal on direct appeal or through post-conviction relief proceedings.[12]

---

[9] If a direct appeal is taken, the petition for post-conviction relief must be filed within 120 days of "the date the appeal is final in the Oregon appellate courts." ORS 138.510(2)(b). Although in that situation the person has longer in which to file the petition for post-conviction relief, filing the appeal within 30 days of the judgment is still a prerequisite to preserving the claim for legal malpractice by achieving exoneration.

[10] In this case, however, the conviction was vacated after another man confessed to the crime. The validity of plaintiff's claim against defendant, his trial lawyer, should not depend on whether another person ultimately confesses, as it will in this case under the majority's "no-exoneration/no-harm" rule. Without the confession, plaintiff's conviction may never have been reversed and his legal malpractice claim against defendant, under the majority's rule, would never accrue, despite the fact that plaintiff may now be able to establish that his negligence claim has merit and that his trial counsel's (defendant's) negligence did, in fact, cause him injury and cause him not to appeal or seek post-conviction relief based on the discovery of the factors listed *supra*, 316 Or at 246. *See infra*, note 11.

[11] In fact, in this case, plaintiff argues that defendant's negligence caused him to plead no contest because there was no reason to resist the charge. By the same reasoning, defendant's advice would arguably lead plaintiff to believe that there was no legitimate ground on which to appeal or pursue post-conviction relief. Thus, *defendant's arguably negligent advice*, by causing plaintiff not to appeal or seek post-conviction relief, *itself would have precluded plaintiff's claim against defendant from ever accruing if another person had not confessed to the crime*. The majority's "no-exoneration/no-harm" rule legitimates the circumstance in which a criminal defendant's lawyer's own negligence serves to prevent a claim for legal malpractice against him or her, apparently numb to this travesty of justice because, in this particular case, an independent intervening factor (a confession by another person) caused plaintiff's claim to accrue under extraordinary circumstances.

[12] This decision not to appeal or file for post-conviction relief may itself be the result of inadequate assistance of counsel, thereby compounding the harm done to the criminal defendant but making it more certain that the criminal defendant will receive no relief. Ironically, in some situations, the less effective the legal assistance

Under the rule created by the majority in this case, by failing to file a direct appeal within 30 days and by failing to commence a claim for post-conviction relief within 120 days, a criminal defendant is, in most instances, effectively denied any claim for legal malpractice against the defendant's lawyer. If the criminal defendant discovers that the lawyer's negligence caused a wrongful conviction on day 121, the criminal defendant's potential malpractice claim, according to the majority, is not preserved in most cases, *i.e.*, unless the criminal defendant is otherwise exonerated of the criminal offense.[13] Thus, in this context, the majority undermines the legislature's two-year statute of limitations for professional negligence claims, effectively shortening the period for plaintiff to do something as a prerequisite to bringing a legal malpractice claim from the *two years enacted by the legislature*, ORS 12.110(1), by requiring that plaintiff do something to preserve the claim within *120 days under the majority's rule*.[14] This is ironic, indeed, in that the majority purports to be advancing the policy decisions set in motion by the legislature, 316 Or at 229-31.

The legislature has chosen to define the statute of limitations for a professional negligence claim as two years, with no distinctions based on whether the claim arises from a lawyer's representation in a civil case or from a lawyer's representation in a criminal case. This court should not

---

afforded a criminal defendant, the more likely it is that the criminal defendant will have no legal malpractice claim. *See supra*, 316 Or at 250 n 10, n 11 and *infra*, 316 Or at 254.

[13] Under ORS 138.510(2), there is an exception to the 120-day time limit for claims "which could not reasonably have been raised in the original or amended petition," which this court has said must be construed narrowly, *Bartz v. State of Oregon*, 314 Or 353, 359-60, 839 P2d 217 (1992). Thus, the claim for post-conviction relief can be commenced after 120 days only if the criminal defendant could not reasonably have known of the claim for post-conviction relief within the 120 days. Under the normal discovery rule for professional negligence, however, a plaintiff has two years from the date he or she knew or should have known of the professional negligence in which to bring a claim. ORS 12.110(1); *U.S. Nat'l Bank v. Davies*, 274 Or 663, 666-67, 548 P2d 966 (1976).

[14] In addition, this 120 days begins from the date of conviction where no appeal is taken. In contrast, the normal two-year statute of limitations does not begin to run before plaintiff knew or, in the exercise of reasonable care, should have known that the defendant's (lawyer's) alleged acts or omissions caused him harm. *See supra*, note 13.

disturb or undermine that legislative determination. A client should not be required to obtain a reversal either of a civil or of a criminal judgment in order to bring a claim against the lawyer for legal malpractice. In crafting and applying the "no-exoneration/no-harm" rule, the majority undermines the legislature's statute of limitations and paradoxically severely limits the effective statute of limitations for legal malpractice claims with respect to a lawyer's defense of a client who has been convicted in a criminal case to 30 or 120 days in most cases while, at the same time, extending the time in which such a claim could potentially accrue indefinitely.

## III. OTHER ANALYTICAL FLAWS EXIST IN THE MAJORITY'S REASONING

The majority argues that a claim for legal malpractice arising out of a lawyer's defense of a client in a criminal case must be treated specially because of the existence of post-conviction relief, but fails to acknowledge that the parameters for a criminal defendant to prevail on post-conviction relief, ORS 138.530, are much narrower than those for professional negligence. More critically, there is nothing *anywhere* in the statutes relating to negligence statutes of limitations, appeals, or post-conviction relief that establishes or suggests that a criminal appeal or a petition for post-conviction relief is a jurisdictional prerequisite for the filing of a timely professional negligence action, much less anything that requires exoneration of the criminal offense through reversal on direct appeal or through post-conviction as a prerequisite for the maintenance of a viable action for legal malpractice arising out of a lawyer's defense of a client convicted of a crime.

Where is it stated in the text or history of any statute that the legislature has enacted the mandatory hoops that the majority requires a plaintiff to jump through before being *permitted* to file a legal malpractice claim against a criminal defense lawyer? I submit that *nowhere* is it so stated, which leaves only the conclusion that the majority has made its own law. The majority has inserted an entire procedural and substantive system into the law when the legislature did not do so, in violation of the statutory mandate to ascertain and declare what is contained in the statute and not to insert what the legislature has omitted, ORS 174.010. Some may consider

this to be an "arrogation of power" by the majority (borrowing a phrase from *Lloyd Corporation v. Whiffen*, 315 Or 500, 556, 849 P2d 446 (1993) (Gillette, J., dissenting)).

In my view, a change in the statute of limitations for professional negligence, if warranted because of the evils feared by the majority, must be made by the legislature rather than by this court. As this court stated in *Heino v. Harper*, 306 Or 347, 370, 759 P2d 253 (1988) (quoting with approval *Norwest v. Presbyterian Intercommunity Hosp.*, 293 Or 543, 552, 652 P2d 318 (1982)):

> "No doubt there are genuine wrongs that courts are ill suited to set right, and others that do not merit the social costs of litigation. But if these costs are to be the reason for denying an otherwise meritorious cause of action, that is one judgment to be made by legislatures rather than by courts. Courts exist to serve whatever rights people have, Or Const art I, § 10; it is not for them to weigh or 'balance' their own institutional concerns against the merits of such a right."

"Shortfalls in procedural reforms do not justify shortchanging otherwise valid claims." *Norwest v. Presbyterian Intercommunity Hosp., supra*, 293 Or at 553.

The majority also fails adequately to account for the fact that, in criminal as well as in civil cases, there is no necessary and direct link between not prevailing in a case and the existence of a claim for legal malpractice. A prevailing party can be harmed by a lawyer's negligence, just as a party can lose even though the lawyer was not negligent. An innocent person can be convicted even with adequate counsel, and a guilty person's conviction can be actionable because a lawyer's negligence failed to protect the rights that even a guilty person has. These are areas not well suited for bright-line rules.[15] The fact that a criminal defendant has not been exonerated of the criminal offense through reversal on direct appeal, through post-conviction relief proceedings, or otherwise, does not mean that a criminal defendant has not been harmed by the lawyer's negligence. Likewise, the fact that a criminal defendant has been exonerated of the criminal offense through reversal on direct appeal, through post-

---

[15] Until today, the rule was that a plaintiff must allege and prove that, but for the lawyer's negligence, the outcome of the case would have been more favorable. *Chocktoot v. Smith*, 280 Or 567, 570, 571 P2d 1255 (1977).

conviction relief proceedings, or otherwise, does not mean that the criminal defendant's lawyer was negligent. Nor does the fact that a person is acquitted at trial mean that the lawyer has not been negligent.

The majority's "no-exoneration/no-harm" rule, in effect, results in an inappropriate form of issue preclusion against criminal defendants. The determination that, based on the evidence and argument at trial, a client (criminal defendant) is proven guilty beyond a reasonable doubt is not the same as the issue of whether the lawyer's negligent representation contributed to or caused the resulting conviction.[16] The majority's "no-exoneration/no-harm" rule, however, allows criminal defense lawyers to hide behind their own negligence by asserting the clients' convictions (although caused by the lawyers' negligence) as defenses to claims that the lawyers were negligent. In contrast, lawyers whose clients do not prevail in civil matters do not have the ability to say to their clients, "You lost; therefore, I was not negligent."

The problem created by the majority's rule can be compounded. A criminal defendant may (1) be wrongly convicted at trial and imprisoned because of ineffective assistance of trial counsel; (2) lose on appeal because of ineffective assistance of appellate counsel; and (3) lose on post-conviction relief proceedings because of ineffective assistance of post-conviction relief counsel, and have no other legal recourse with respect to that conviction, *Church v. Gladden*, 244 Or 308, 311, 417 P2d 993 (1966). Today, the majority decides that the cumulative effect of all of this legal malpractice is that the criminal defendant has not even been harmed and, thus, has no claim against any of the lawyers whose representation was negligent and resulted in the wrongful conviction and continued imprisonment. Such a rule should not be made without at least considering its implications. For example, before creating a new rule, the majority should

---

[16] It is particularly evident in this case that the issues are not the same in the two actions. In this case, plaintiff was convicted following the trial court's acceptance of his no-contest plea. A no-contest plea is not an admission of guilt. A no-contest plea is not automatically accepted by the court, ORS 135.335(2), *see supra*, note 3. If the no-contest plea is accepted by the court, the criminal defendant's guilt is not actually litigated.

consider whether the "no-exoneration/no-harm" rule violates Article I, section 10, of the Oregon Constitution, which provides that "every man shall have remedy by due course of law for injury done him in his person, property, or reputation." *See* Schuman, *Oregon's Remedy Guarantee: Article I, Section 10 of the Oregon Constitution*, 65 Or L Rev 35 (1986). Unfortunately, the majority finds it more convenient to ignore the implications of its new rule even while making new law.

The posture of this case also should give the majority pause. Deciding that a criminal defendant must be exonerated before he may bring a legal malpractice claim affects criminal defendants generally and perhaps adversely, yet the criminal defendant in this case (plaintiff in this legal action) benefits from the majority's rule and understandably would applaud it because, under that rule, plaintiff's claim is timely as a matter of law. Defendant in this case, against whom the legal malpractice claim is brought, is adversely affected by the rule created by the court, but is in an awkward position to argue that the rule generally should be otherwise in order to protect criminal defendants' rights when the lawyer is being sued by a criminal defendant for representing him negligently. Thus, no one before the court is in a strong position to present arguments against the majority's decision, and *amicus curiae* briefing on the issue has not been invited. I believe that the issue is too significant to be handled so cavalierly.[17]

In addition, the majority's "no-exoneration/no-harm" rule fundamentally confuses the separate concepts of occurrence of harm and extent of damages, a distinction that this court emphasized in *Jaquith v. Ferris, supra*, 297 Or at 788. In that case, plaintiff acknowledged that she was aware

---

[17] Indeed, the argument that a claim for legal negligence does not accrue unless and until the client's conviction is reversed was not raised in the trial court or in the Court of Appeals and was not briefed to this court until after this court raised the issue *sua sponte* during oral argument. *See supra*, note 2. The arguments against the majority's conclusion that a claim for legal negligence does not accrue unless and until the client is exonerated undermines the legislature's statute of limitations, *see supra*, Part II, or is subject to other analytical flaws and results in a constitutional violation, *see supra*, Part III, were not made by the parties. Other arguments should be considered and would be made if this case were decided in a different posture, *i.e.*, after being properly preserved, fully briefed and argued. Nevertheless, the majority, without a glance to the side, boldly forges ahead.

of an error in a contract due to an allegedly faulty property valuation. She argued, however, that, because she asserted contract defenses in appellate proceedings that could have avoided the damage, the harm did not occur until those appellate proceedings were complete. This court did not agree:

> "Plaintiff's argument that she sustained no harm until the extent of her damage was ascertained, or, in this case, until an appellate decision finally forced her to convey the property, mixes two discrete concepts, the occurrence of harm and the extent of damages." *Id.*

The court held that she was harmed when she discovered the error in the contract. *Id.*

Likewise, in this case, the majority is mixing two discrete concepts, the occurrence of harm and the extent of damages. As a practical matter, there can be no doubt that, if a criminal defense lawyer's negligence causes a client to be wrongly convicted and imprisoned, the client is harmed on the first day of the sentence of imprisonment, if not before. That is a question of when the harm *occurred*. The *extent* of the damage, but not its occurrence, is affected by whether the person is ultimately exonerated. As a practical matter, there can be no doubt that the extent of the client's harm is less if the client has been exonerated of the criminal offense through reversal on direct appeal, through post-conviction relief proceedings, or otherwise, and the client is released from custody, but the client still has been harmed, as even the majority recognizes. However, the *extent* of the damage to the client who is wrongly convicted because of the lawyer's negligence is *greatest* if the person is *never exonerated*[18] and the client serves the full sentence. And yet, it is in the situation that the person has not been exonerated that the majority mixes the concepts of occurrence of harm and extent of damage and concludes that, in the situation in which the harm is greatest, there has been no harm at all.

## IV. THE MAJORITY'S RULE IS AMORPHOUS

In Parts I, II, and III of this specially concurring opinion, I have referred to the majority's holding as if it clearly stated a rule as to when the statute of limitations for

---

[18] This is particularly true if the reason the person is never exonerated is also related to the lawyer's negligence. *See supra*, note 12.

legal malpractice begins to run with respect to a lawyer's defense of a client who has been convicted in a criminal case. In fact, it does not clearly state a rule, which makes the majority holding all the more troubling.

The majority states that there is no harm until the person "has been exonerated of the criminal offense through reversal on direct appeal, through post-conviction relief proceedings, or otherwise." 316 Or at 223, 238. What is not clear is what the majority means by the term "exoneration." The Random House Dictionary of the English Language (unabridged 2d ed 1987) 679 defines the verb "exonerate":

"1) to clear, as of an accusation; free from guilt or blame; exculpate * * * 2) to relieve, as from an obligation; duty, or task."

There are several possible meanings of the term "exoneration" that the majority could be intending, each of which finds some support in the majority's analysis. Some of those possible interpretations are:

*Actual Innocence:* Underlying the majority's analysis is the theme that a guilty person has not been harmed by a conviction and thus should not be able to sue his or her lawyer as a result of a conviction, regardless of whether the person, although guilty, should have been acquitted or should have received a lesser sentence. Although that concern no doubt drives the majority's analysis, even the majority must recognize that our criminal justice system simply does not have a mechanism for determining actual innocence.

Rather than determine actual innocence, our criminal justice system declares persons to be either guilty or not guilty.[19] Even a finding by an appellate court or by a post-conviction court that there is insufficient evidence to convict a person is not a finding that the person is actually innocent of

---

[19] Of course, some of those persons deemed to be not guilty did in fact commit the charged criminal acts. Our criminal justice system affords all persons the presumption of innocence and related guarantees that may be asserted in defense of a criminal accusation. Only after the rights are asserted and a judgment entered is a person deemed to be guilty or not guilty, with a determination that a person is not guilty making no distinction regarding whether the person is actually innocent.

the criminal offense, but is, instead, a finding that the evidence presented by the prosecutor is not sufficient to establish guilt beyond a reasonable doubt. Thus, while the concern for actual innocence drives the majority's analysis, that concern could not be the basis for applying its rule.

*Legal Innocence (litigated):* Another possibility is that the majority intends that a person is exonerated only when the person has actually been found to be not guilty. Perhaps under this interpretation some reversals on direct appeal or through post-conviction relief proceedings which preclude further prosecution would constitute exoneration, but it is not clear under what circumstances that would be the case. However, some reversals on direct appeal or through post-conviction proceedings may only determine that *the particular* conviction is not valid, but may leave open the possibility that the person could be retried and convicted again on remand. In that event, if an affirmative finding of legal innocence is required, a person is apparently not exonerated until there has been a new trial and the person is actually acquitted, at which time, according to the majority, the person is harmed for the first time.[20]

Of course, this approach suggests that, although the person's conviction has been determined to be invalid for purposes of determining whether the person has been harmed, the person is *presumed to be guilty* until there is a finding to the contrary. That presumption of guilt flies directly in the face of the constitutional and statutory presumption of innocence, *see State v. Boots*, 315 Or 572, 594, 848 P2d 76 (1993) (Unis, J., dissenting) (citing sources of the presumption of innocence), to which a person whose conviction has been set aside must be entitled.

Moreover, if an affirmative finding of legal innocence is required, that presumption of guilt ends up, in effect, being conclusive in the situations in which it is most clearly wrong.

---

[20] It is even less clear how the majority's rule would apply to other forms of setting aside a conviction, such as a pardon by the Governor. Such a pardon could be granted because the conviction is considered unjust because of ineffective assistance of counsel or for some other reason, it could be granted because of a belief in a person's innocence, or it could be granted in spite of a person's guilt for some other reason. A pardon could be granted for a combination of reasons, and the reason may not even be specified. In any event, after a pardon, a person is no longer subject to any possibility of conviction for the crime at issue.

For example, in a situation in which a person's conviction is set aside, but the case is remanded for a new trial, the prosecutor may conclude that the person is in fact innocent and decide not to prosecute again. In that case, the person is never actually acquitted and, under this interpretation, apparently is never exonerated. According to the majority, where there is no exoneration, there is no harm and, thus, no possible claim for legal malpractice.

***De facto Legal Innocence:*** Another possibility is that a person is exonerated when the person can no longer be prosecuted for the criminal offense. Under this interpretation, after a person's conviction has been set aside, the person is still presumed guilty as long as the person could still be prosecuted for the crime. That presumption would disappear and the person would be exonerated (and thus harmed, according to the majority) when, for example, jeopardy attached (either through acquittal on retrial or otherwise) or the statute of limitations period expired, preventing subsequent prosecution.

Although this interpretation still flies in the face of the constitutional and statutory presumption of innocence described under the previous interpretation, the presumption of guilt is automatically overcome at some point in most cases because the statute of limitations period will expire if nothing is done to pursue the case. The presumption of guilt is never automatically overcome, however, under this interpretation in the most significant case, involving a reversal of a murder conviction, because there is no statute of limitations for murder, ORS 131.125. Therefore, the presumption of guilt would, in effect, be conclusive.

For example, under this interpretation, a criminal defendant could be wrongly convicted of aggravated murder entirely as a result of the defendant's lawyer's negligence. After the criminal defendant serves years in prison, the conviction could be reversed and the case remanded for a new trial. At that point, if the prosecutor decides not to prosecute the criminal defendant again, believing now that the criminal defendant is innocent, acquittal never would occur and jeopardy never would attach. Because there is no statute of limitations for aggravated murder, the criminal defendant

apparently never would be exonerated. Under any interpretation of the term "exonerate" that requires that the criminal defendant could not be prosecuted for the crime again, the criminal defendant in this situation never would be harmed and never would have a claim against his negligent lawyer under the majority's "no-exoneration/no-harm" rule.

***Presumed Innocence:*** It also would be possible to conclude that a person is exonerated when the person's conviction is set aside for whatever reason. That is, the majority builds its analysis on the "policy" of respecting the presumption of guilt accompanying valid convictions. Under this analysis, the presumption of guilt disappears when the conviction is no longer valid. Although the person could ultimately be prosecuted and convicted again for the same crime after the conviction is reversed, this interpretation of exoneration gives meaning to the statutory and constitutional presumption of innocence once the conviction is determined to be invalid. However, this interpretation would suggest that the key is that the person be exonerated from *this conviction*, whereas the majority requires that the person be "exonerated of the *criminal offense*," which suggests that more is required than simply a finding that this conviction was invalid by reversal on direct appeal or in post-conviction proceedings.

Nevertheless, in applying its rule to this case, the majority states that plaintiff was exonerated and therefore harmed when his conviction was vacated, 316 Or at 239, without any inquiry whatsoever into the reason that his conviction was vacated or the effect of his conviction being vacated.[21] Thus, without knowing whether plaintiff could be prosecuted for the crime again, the majority is able to announce that plaintiff has been exonerated (and, as a result, that plaintiff has been harmed).

There are other ambiguities inherent in the majority's rule. For example, is a person whose conviction for

---

[21] We are told by the parties that another person confessed to the crime for which plaintiff was convicted, and the majority states that to be true, 316 Or at 223, but the record before us does not contain the order vacating the conviction. We thus do not necessarily know why plaintiff's conviction was vacated or what effect vacating the conviction has, but that fact appears to be irrelevant to the majority, because it is not considered in concluding that plaintiff was exonerated as a matter of law on the date that his conviction was vacated.

aggravated murder is reduced to manslaughter exonerated under the majority's rule, assuming, *arguendo*, that the reason for the aggravated murder conviction was the defense lawyer's negligence? Why is a person sentenced to death in the penalty phase of an aggravated murder trial not harmed when it is clear that, but for the defense lawyer's negligence, the requirements for imposing the death penalty would not have been satisfied? For that matter, why is a person who is sentenced to the maximum penalty not harmed when it is clear that, but for the defense lawyer's negligence, the person would have been sentenced to a lesser penalty?

If the majority was forced to choose precisely what it means by the term "exonerate," it would find its application difficult and troubling. By refusing to define what it means by exoneration, however, the majority can pick and choose the parts of the analysis and application it likes under the illusion that all of its analysis is consistent with its conclusion. Indeed, it is impossible to say whether any one part of the majority analysis is inconsistent with the majority's conclusion because the majority's rule is amorphous. Unfortunately, that leaves parties and lawyers guessing about a new but critical aspect of a claim for legal malpractice — determining when exoneration (*i.e.*, harm) occurs.

## V. CONCLUSION

I concur in the majority's holding that summary judgment for defendant was not proper in this case. However, for reasons stated above, I cannot concur in the majority's "no-exoneration/no-harm" rule. In crafting that rule, the majority clings to a legal fiction defining harm that utterly fails to resemble reality. I regret that the majority does not see how wrong that rule is.

Fadeley, J., joins in this opinion.